# CONNER v. DEAN.

---

PATENTS; COUNSEL; PRACTICE; INTERFERENCE; REDUCTION TO PRACTICE; ORIGINALITY.

1. The practice of counsel in patent cases in filling the record with immaterial, irrelevant, and useless matter, reprobated by the Court as entailing useless expense upon their clients and needless labor upon the tribunals of the Patent Office and upon this court. Objections should be stated in few words, and unnecessary repetition of testimony avoided.

2. In an interference case involving the invention of a four-party-line indicating key for telephone switch boards, it was *held*, on a review of the evidence, that a sample key made by the junior party contained the indicating feature of the issue, which was the essence of the invention, and that the making of the key constituted a reduction of practice, for the reason that the operativeness of the device would be apparent to anyone skilled in the art.

3. In an interference case in which the real parties in interest were rival telephone-supply companies, the assignees of the junior and senior parties, involving the invention of a four-party-line indicating key for telephone switch boards, where it appeared, among other things, that the junior party, about four or five years before he filed his application, devised a key embodying the invention of the issue, and exhibited it to the engineers of his then employer, an electric company; that the senior party was in charge of the laboratory of the company, interested in such devices and in a position to have seen the one in question, and testified he saw it, and disclaimed to have invented it; that the senior party's application, assigned to his employer on the day it was made, did not originally contain the claim of the issue, but that claim was subsequently inserted by his assignee without his knowledge,—it was *held* that the junior, and not the senior, party was the original inventor.

No. 544.. Patent Appeals. Submitted November 20, 1908. Decided January 5, 1909.

HEARING on an appeal from a decision of the Commissioner of Patents in an interference case.        *Reversed.*

The facts are stated in the opinion.

*Messrs. Brown & Williams* for the appellant.

*Mr. Curtis B. Camp* and *Mr. Benjamin R. Johnson* for the appellee.

Mr. Justice ROBB delivered the opinion of the Court:

This is an appeal from three concurrent decisions of the Patent Office tribunals in an interference proceeding, in which priority of invention was awarded William W. Dean, the nominal appellee.

The real parties in interest are the Stromberg-Carlson Telephone Manufacturing Company, Conner's assignee, and the Kellogg Switchboard & Supply Company, Dean's assignee.

The issue is expressed in one count and is as follows:

"In an operator's ringing key, the combination with a suitable supporting frame, of a plurality of vertically reciprocating plungers and a plurality of switch springs carried by said frame, each of said plungers having three distinct positions, a normal position, an intermediate position, and an operative position, said plungers being adapted to actuate said springs when in the last-mentioned position to put ringing current upon the line, and means for releasing any one of said plungers from the intermediate position when any other of said plungers is moved to the operative position."

We adopt the following description of the invention by the Examiners-in-Chief:

"The invention which forms the subject-matter of this controversy is a four-party-line key for telephone switch boards. In instruments of this character it has long been possible to call up any of the four parties without ringing up the remaining parties, distinct and separate plungers being provided for each party. But occasion frequently arises where the party called fails to respond, and it is necessary for the operator to call him again. For this purpose it is desirable to have in a key of this character some indication of the party last called. The construction common to both parties is a framework in which is mounted a series of plungers corresponding to the number of parties on the line, which plungers are normally springs pressed upward through an escutcheon plate and provided with finger pieces for depression individually. Each plunger is provided with a wedge which is adapted to enter between and spread apart a pair of springs, which springs are thereby forced into contact with other springs arranged outside thereof to complete the circuit and ring the bell of the corresponding subscriber. In order to effect the indication referred to above, a catch is provided common to all the plungers, and adapted to lock them in a position intermediate to that in which contact is had between the

circuit closing springs, hereinafter referred to as the ringing position, and the fully raised position. It is thus seen that each plunger has three distinct positions, the normal position, the operative or ringing position, and the intermediate position in which the plunger is partially depressed but no contact is made in the circuit. In each case, also, the catch which holds the respective plungers in their depressed position is such that, on depressing the plunger, it releases that previously depressed, so that but one plunger is held depressed at a time. * * * The key of the issue is new only in certain particulars. Before this invention a so-called master key had been employed for this purpose in which a series of plungers, such as those in issue, was employed, each plunger being adapted to operate a pair of springs on being depressed. A catch common to the series was provided to hold the plunger last operated in its depressed position until another plunger was operated. In this key the plungers were locked down by the catch with the springs in position to close the circuit, but the ringing current was only sent when an additional switch was closed by the operation of a ringing lever. It appears that in this master key it was not essential that the plunger be locked in its lowermost position, but only that it be locked sufficiently depressed to hold the springs in contact. In such a construction the position of the key last depressed gives an indication, just as does the key of this issue, but such a signal is without importance since, to ring again the last subscriber called, it is only necessary to operate the ringing lever. Such a master key may also be said to have three positions, but functionally it has but two, since in the locked position, as well as in the fully depressed position, the springs operated by the plunger are in contact. The gist of the present invention is a key in which the plungers have three positions, in the intermediate of which the springs are out of contact with each other, and in the fully depressed position the plunger rings the subscriber without the necessity of the use of the ringing lever. While in the master key, as before pointed out, it was not necessary when the operator desired to call again the subscriber last rung, to know which plunger had been depressed, it is apparent

that in the key of the issue such knowledge is absolutely essential." It will be observed that the essence of this invention consists in the indicating feature.

Before proceeding to a consideration of the case, we deem it proper to express our disapprobation of the conduct of counsel in filling the record with immaterial, irrelevant, and useless matter. This practice, which is altogether too general in patent cases, entails needless expense upon clients and much needless labor upon the tribunals of the Patent Office as well as this court, and should be discontinued. Objections can, and should, be stated in few words, and "vain repetition" of testimony avoided.

The record discloses that at the time the testimony was taken the Kellogg company had been absorbed by the Bell Telephone Company, and that the Western Electric Company was the manufacturing department of the Bell company. The interference originally contained a third party, one Manson, against whom judgment was entered because in his preliminary statement the date of March 17, 1904, was given as his date of invention. This date was subsequent to the filing date of either of the other parties.

Conner is a telephone engineer, and at the time he claims to have made this invention was employed by the Western Electric Company. He was then, as now, highly skilled in the art. Sometime in the fall of 1898 he was directed to design a four-party-line key, and soon thereafter did design such a key. Thereupon a full-sized sample key was manufactured in accordance with his design. The free-hand drawing, from which the sample key was made, was introduced in evidence. This drawing bears date of October 9, 1898, and is witnessed by Conner's superior, McQuarrie. It is entitled "Combined Listening & 4-party-line Ringing Key," and contains the notation "Pushing keys to notch does not ring." The sketch shows a key in longitudinal section and detailed views. The cam at the left of the device is marked "No. 6 cam," and below the cam appear the words "All contacts on the key platinum." Conner testified that the sketch was complete in every particular before the orig-

inal key was made. He also stated that the terms "No. 6 cam,"
and, "All contacts on the key platinum," show that the cam
was a listening, and not a ringing, cam because the listening
cam of the Wester Electric Company was known as "No. 6,"
and that platinum contacts were not used with ringing cams.
This latter testimony was given no weight by the tribunals of
the Patent Office because not supplemented by other corroborat-
ing testimony, notwithstanding that it was not disputed by the
appellee, who could easily have disproved it had it been untrue.
Conner submitted the sample key to McBerty, who was in
charge of the patent department. McBerty concluded that the
key was not of sufficient merit to justify its being patented.
Subsequently the key was sent to the New York factory of the
company where it was redesigned. It is worthy of notice that
the redesigned key contained an indicating feature, which, how-
ever, differed radically from that claimed by Conner to have
been present in his key. Conner was asked why he did not
himself apply for a patent when McBerty declined to do so, and
he replied he believed it would jeopardize his position with the
company to make an application for himself. Being further
pressed for reasons, he stated: "Because in this particular in-
stance, although Mr. McBerty was in charge of the patent de-
partment, any employee who made any attempt to carry on any
kind of business operation outside of the company was ques-
tioned and brought to task by parties entirely different from
Mr. McBerty, who would, in a case of this kind, have used their
own judgment as to whether the key was of importance or not,
rather than take the word of Mr. McBerty. As long as I re-
mained with the Western Electric Company I was subject to Mr.
McBerty's orders, and what I could have gotten out of this mat-
ter would hardly have been worth having any friction with him."
In March, 1900, Conner was sent by the company to Antwerp
where he remained in charge of the company's office for two
years and ten months, or until January, 1903, when he returned
to this country and re-entered the home office at Chicago. On
September 10, 1903, he left the Western Electric Company, and
became the chief engineer of the Stromberg-Carlson company.

He testified that he was exceedingly busy for some time in organizing the engineering department of that company, which caused him to delay the filing of the application in interference until May 19, 1904. He further testified that he had been careful to retain the original sketch from which the sample was made, and that he had no idea of abandoning his invention. After Conner became the chief engineer of the Stromberg-Carlson company, he designed a key for that company, which did not contain the indicating feature of the issue. In explanation of this apparent inconsistency, he says the indicating key is designed for equipping central offices in residence districts where practically all subscribers are on a party-line basis, and that the Stromberg-Carlson company and its customers being on the direct-line basis, experience had demonstrated that a party-line ringing key slowed down the traffic "on account of the fact that the operator had of necessity to select a specific button each time she rang, whether the call was for a party-line subscriber or a direct-line subscriber."

We will first determine the important question whether or not the sample key made from Conner's design drawing embodied the issue, and, in reviewing the testimony of the witnesses on that question, two important facts must be kept in mind, namely, that the indicating feature claimed by Conner to have been present in the sample key was new, and that the witnesses who saw the key and testified concerning it were highly skilled in the art, and, therefore, likely to recognize and remember so novel a feature. Charles W. Boethelt, who, when he testified, was employed by the Dean company, was one of the mechanics who made the original Conner key. This key he made from the Conner sketch, which was handed him by his foreman Mr. Spies. He identified the sketch as the one from which he made the original key. He was asked how the plungers and locking bar worked in this key, and replied: "When you pressed the plunger, it gave the bar the end motion until you reached the straight part of the notch which locked same. In order to release this plunger, you would have to do so by pressing either of the other keys until it released itself." He was further asked: "As you

remember it, about how far down was the locking position of the plungers of this old model key which you made?" and he answered: "About ⅜ of an inch." He was then asked: "How much was the full stroke of the plungers, as you remember it?" and replied: "About ⅝ of an inch." The witness did not remember the exact number of springs to each plunger, and so stated in his direct examination. It is contended that his cross-examination lessens the weight of the testimony above quoted; but we think a careful reading of all the testimony of the witness shows that he was certain at all times about the indicating feature.

George Throop, an electrical-instrument maker employed by the Dean company, but formerly employed by the Western Electric Company, testified that he saw Boethelt working on the Conner key, and that he saw the key in its completed condition. He described the key in detail, and was certain about the indicating feature. In cross-examination he was asked how he happened to remember the key, and replied: "That key being entirely new, something I had never seen before, always caused more attention than modification and changes in stuff we had seen before."

*Q.* And there was no other reason, excepting that it was a new form of ringing key, that caused you to notice it; is that right?

*A.* The style of the key, as I remember, was much simpler than the more complicated apparatus then in use.

*Q.* In what way was this key simpler in construction than the key then in use by the Western?

*A.* On that key the plungers would lock and show the operator the key that had been depressed before. I never saw anything like it before.

A. C. Dodge, an assistant shop superintendent in the engineering department of the Western Electric Company, and in the employ of that company when he testified, stated that Conner exhibited and explained his key to witness at the time it was made. The witness was questioned concerning the indicating feature, and replied: "The button was not restored to its normal position

on account of the rack; this rack is so arranged that the plunger would be forced far enough—so that the—as soon as the plunger left the springs, it caught, and it was held in this position until another key was depressed." He was asked whether he snapped the buttons himself to see how the key operated, and replied that he did. The witness examined Conner's original sketch, and stated that it showed the key he had described and which had been exhibited to him by Conner. It developed in cross-examination that the witness did not feel free to discuss the case with counsel for Conner until after he had been subpœnaed, "and then only in a general way." The witness was asked on cross-examination the following question: "What fixes the time of this disclosure in your mind; was there anything peculiar about this particular conversation that impressed it upon your mind any more than any other chance conversation that you may have had about the same time?" and replied: "I remember that the question of an indicator for a four-party-line key was receiving a good deal of attention at that time, and that when Mr. Conner's model was brought out, we thought,—we thought that he had solved the problem; and when he was told that it would not be patented,—when he was told that it was not to be patented,—he was very much displeased, and, as I remember it, so informed a number of his associates in the department."

McBerty, to whom Conner submitted his key for patent, did not remember the indicating feature. The following statement from his testimony is significant and corroborative of Conner's contention that his invention did not meet with approval: "At the time Conner brought his model to me the idea of causing the key to indicate which of the parties of the line had been called was familiar to myself and a number of others, *though there was considerable doubt and some discussion as to whether the use of such an indicator was of substantial aid to the operator."*

Malcolm F. Launbranch, a telephone engineer and formerly employed by the Western Electric Company, and at the time of his testimony with the Western·Electric Company of San Francisco, a branch of the former company, was apparently reluctant

to testify in Conner's interest. He stated that he knew Conner and was associated with him in 1898 and 1899 in the same office, and that both were then engaged in designing telephone exchanges. After ineffectual efforts to obtain information from the witness, he was asked whether he did not receive a letter from Conner dated July 3, 1906, requesting him to state what information, if any, he possessed concerning the original Conner key, and he admitted that he did, and identified his letter dated August 8, 1906, in reply, in which letter he stated: "I distinctly remember your working upon the design of this key at the time we were together in Chicago. I do not definitely recollect the date thereof, but what I do recollect is that we were in the small room adjoining the drafting room, I think it was on the 7th floor, and I believe Mr. Smythe and Mr. Dixon were in the office with us. I remember your plan of having the key depressed half way and staying there as an indicator, and of using the shifting latch for holding the key in this position." The Patent Office tribunals have given little weight to this letter because in his testimony the witness sought to modify it. We, on the contrary, attach far greater weight to the letter than to his testimony.

R. W. Ingersoll, an electrical engineer of the Western Electric Company, was handed Conner's original drawing and asked to describe the mode of operation of the keys therein shown. We reproduce his answer: "It is my understanding that this key was designed for use in an operator's cord circuit, when used in connection with party lines. It is my understanding that the mechanism is such that each button has three positions, a normal position, an intermediate position, and an extreme position; the structure being such that when a key is depressed to its extreme position it opens one set of contacts and closes another set. That said button does not return to its normal position upon release, but returns to an intermediate position, wherein it is locked until another of the gang of buttons is depressed."

J. L. McQuarrie, Conner's immediate superior when he designed the key in 1898, did not remember the Conner drawing, but his testimony concerning the operation of the key therein shown was similar to that of the witness Ingersoll.

Conner caused a search to be made in the model room of the New York factory of the Western Electric Company for his sample key, but was unable to locate it.

We think the conclusion irresistible that Conner designed a key containing the subject-matter of this interference in 1898, and that a full-sized sample key was constructed in the winter of 1898–99. It is admitted that he was directed to design a four-party-line key; that he designed such a key; and that one was made and sent to New York. The testimony, we think, leaves no room for doubt that the original key contained the indicating feature of this issue, and we so hold.

That the making of the sample key constituted a reduction to practice is equally plain, for the reason that the operativeness of the device would be apparent to anyone skilled in the art. There was little in the key that was new, and several witnesses examined it carefully, observed the relation of the parts, and pronounced the invention a success. The device was operative if contact was made in the circuit when a plunger was in its fully depressed position, and such contact broken when the plunger assumed its intermediate, or indicating position. The testimony establishes the existence of these conditions.

Dean was employed by the Western Electric Company at the time Conner's key was designed and made. He was then an electrical engineer of experience and a prolific inventor. He testified that the question of selective party-line service was attracting a great deal of attention, and that the keys then used were not provided with any indicating features; that the members of the Western Electric Company's engineering department frequently discussed the best way to accomplish this result, and that he, among others, worked on the problem; and that Conner came to him with a model of an indicating ringing key for his inspection and criticism. The witness explained the key in detail, and his testimony, if accepted, establishes that the invention when made was fully disclosed to and understood by him. Subsequently Dean entered the employ of the Kellogg company, and was soon called upon to design an indicating party-line key. He testified that, not having seen or heard of any patent of the

Conner key, he went to work along that line; that he developed a key and in January, 1903, submitted it to Mr. Ames, the patent attorney of the company, for patent; that it was his intention, and he so instructed Mr. Ames, to claim a patent only on the specific construction of his key, and that he did not intend, and so informed Mr. Ames, to claim the broad idea of the issue; that he assigned the invention to the Kellogg company the day he executed the application for patent; that the application did not contain the claim of the issue, which claim was subsequently inserted without his knowledge or consent; and that early in 1903, learning that the Kellogg company had been absorbed by the Bell interests, he left the company and became one of the organizers of the Dean company at Elyria, Ohio, a concern now in litigation with the Bell interests.

Ames testified in behalf of appellee that he did not remember being informed by Dean that he, Dean, was not the inventor of the indicating feature, and that he was quite certain he would have remembered had Dean so informed him, but the significant fact remains that the claims as originally drawn and submitted to Dean were based upon the specific construction of the Dean key, and that subsequently, without Dean's knowledge, the claim of the issue was inserted. Ames says of the original claims: "In the present case I presented the claims with the idea of later amending, if possible, or rather if practical, to include the broad feature of indicating. Some time before the case was filed I gained the impression that the American Electric Telephone Company was making, or using, or going to use, a key embodying this feature, and, while I wished to file an application on the key to save our rights, I wanted to be a little circumspect about claiming this feature until I found out for sure about their device." Just why it was necessary for him "to be a little circumspect about claiming this feature" until he found out about the device of the American Electric Telephone Company, is not clear. We are inclined to the opinion that Dean's recollection concerning this point is the more reasonable of the two.

In support of Dean's testimony, Conner called two witnesses, Manson, and one Libby.

Libby is an electrical engineer, and was Dean's assistant in the engineering department of the Western Electric Company when the Conner key was invented. He testified that he heard Dean and Conner discussing the key; and, being interested in a four-party-line key, he subsequently discussed the Conner key with Dean, who, by means of sketches, explained it to him. The witness described the key, and his testimony, we think, leaves no room for doubt that Dean then knew of the Conner construction. Some attempt is made to discredit Libby because he was not certain whether, when Dean and Conner discussed the Conner key, it had then been sent to New York. After such a lapse of time an error as to a minor detail like this is not of much consequence. Attention is directed, however, to Libby's answer to cross-question 77, in which he states that he "heard the words 'design,' 'construction,' 'manufacture,' 'New York,' and others enough to know they were talking about a four-party-line key, and that this had been sent to New York, or was going to be sent for their New York house to see."

Manson is an electrical engineer, and was employed by the Western Electrical Company in 1899, and later as Dean's assistant with the Kellogg company. Witness testified that he first learned of the indicating ringing key from Dean in August, 1899, and that Dean then gave Conner the credit of inventing it. The witness explained the Conner construction. This witness is discredited by the tribunals of the Patent Office because he made oath to his preliminary statement in this interference. The application as filed did not contain the claim of the issue, but, like Dean's original claim, embodied the specific construction of Manson's device. Subsequently, without his knowledge, the claim of the issue was inserted by his attorney, and thereafter he made oath to his preliminary statement. He explains that he took it for granted that the preliminary statement referred to the application as filed. We are inclined to accept this explanation for the very sufficient reason that in his preliminary statement he claims March 17, 1904, as his date of invention. Knowing, as he did, not only the date of the Conner invention in 1898, or 1899, but also the date of Dean's invention in 1903,

manifestly his preliminary statement was not made with refer-
ence to the claim of the issue.

Having in mind the established fact that Conner devised a
four-party-line indicating key ; that such a key was actually made
and exhibited generally to the engineers then in the Western
Electric Company's engineering department; that Dean was in
charge of the laboratory, interested in such devices, and in a
position to have seen this one; that he himself states that he saw
it ;. and that his testimony is corroborated,—we hold that Conner,
and not Dean, was the original inventor.   And, in reaching this
conclusion, we are not unmindful of the well-recognized and
salutary rule that the burden is heavily upon the party who has
slept on his rights while another has given the invention to the
public.   We have examined the record with care, and are con-
vinced that the circumstances surrounding Conner at the time he
made the invention are consistent with and corroborative of the
affirmative testimony that he, and not Dean, was the original
and real inventor.

The decision of the Commissioner of Patents is reversed, and
the clerk of the court will certify this opinion and the proceed-
ings in this court to the Commissioner of Patents, as required by
law.                                                *Reversed.*